AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original

**LODGED**
CLERK, U.S. DISTRICT COURT
6/10/2026
CENTRAL DISTRICT OF CALIFORNIA
BY: _____KM_____ DEPTUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

**FILED**
CLERK, U.S. DISTRICT COURT
June 10, 2026
CENTRAL DISTRICT OF CALIFORNIA
BY: _____MP_____ DEPUTY

| | |
|---|---|
| United States of America,<br><br>v.<br><br>Juan Carlos Hernandez Pineda,<br><br>Defendant | Case No.   2:26-mj-03472-DUTY |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of June 8, 2026, in the county of Los Angeles in the Central District of California, the defendant violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 922(g)(5) | Illegal Alien in Possession of a Firearm |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____/s/_____
*Complainant's signature*

Phillip J. Top, ATF Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   June 10, 2026

*Judge's signature*

City and state:   Los Angeles, California

The Hon. Anna Y. Park, U.S. Magistrate Judge
*Printed name and title*

AUSA: Iricel E. Payano (x3899)

## <u>AFFIDAVIT</u>

I, Phillip Top, being duly sworn, declare and state as follows:

### I.  <u>PURPOSE OF AFFIDAVIT</u>

1.    This affidavit is made in support of a criminal complaint and arrest warrant against Juan Carlos HERNANDEZ Pineda ("HERNANDEZ") for a violation of 18 U.S.C. § 922(g)(5): Illegal Alien in Possession of a Firearm.

2.    This affidavit is also made in support of an application for a warrant to search the following digital device in the custody of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), in Riverside, California, as described more fully in Attachment A: one white iPhone in black case seized from a gray Jeep Compass on June 8, 2026 ("SUBJECT DEVICE");

3.    The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 922(g)(5) (Illegal Alien in Possession of a Firearm) as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and

statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5.    I am a Special Agent ("S/A") with ATF, and have been so employed since March 2023.  I am currently assigned to the ATF Los Angeles Field Division, Riverside Field Office.  As an S/A for ATF, I have participated in multiple investigations involving violations of federal laws and regulations, including cases involving prohibited persons possessing firearms, illegal sales or transfers of firearms, the distribution of illegal narcotics, and persons trafficking firearms.  In order to become an S/A with ATF, I attended the 27-week Criminal Investigator and Special Agent Basic Training Academies for the ATF in Glynco, Georgia.

6.    Prior to being employed as an ATF S/A, I was employed with the United States Border Patrol for approximately eight years.  During that time, I had many specialized assignments, which included the Sector San Diego Prosecutions Unit, three separate task forces, and the Sector San Diego Office of Emergency Management.

7.    I was also a Maritime Enforcement Specialist with the United States Coast Guard Reserve for eight years.  During this period, I was tasked as a Facility Inspector, Boarding Officer, Boat Team Member, Training Petty Officer, and Rescue & Survivor Petty Officer, among other assignments.

8.    In 2012 I earned my bachelor's degree from Central Washington University, majoring in Law and Justice.

### III.  SUMMARY OF PROBABLE CAUSE

9.   HERNANDEZ was driving on the I-10 freeway within the Central District of California when he was stopped by a United States Border Patrol agent.  HERNANDEZ ultimately granted consent for an exterior canine sniff to be done on his vehicle. The canine alerted and a vehicle search was conducted. The vehicle search revealed 11 firearms, 23 magazines, and approximately 36 rounds of ammunition concealed inside the vehicle.  HERNANDEZ stated he purchased the firearms in Phoenix, Arizona.  HERNANDEZ also admitted that he was born in El Salvador and is unlawfully present in the United States.  Agents also recovered the SUBJECT DEVICE from HERNANDEZ's vehicle.

### IV. STATEMENT OF PROBABLE CAUSE

10.  Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.    Traffic Stop of HERNANDEZ:**

11.  On June 8, 2026, Border Patrol Agent Jaime-Molina was parked on the median of Interstate 10, about seven miles east of the Dillon Road Exit. Agent Jaime-Molina was driving a marked Border Patrol vehicle with emergency lights, sirens, and Border Patrol emblem.

12.  At approximately 12:50 A.M., Agent Jaime-Molina saw a grey Jeep Compass (the "Jeep"), bearing California license plate 8VUS608, approach his location.  The driver and sole occupant was later identified as the defendant, Juan Carlos HERNANDEZ Pineda ("HERNANDEZ").

3

13.  As the Jeep approached, Agent Jaime-Molina saw HERNANDEZ drastically reduce its speed.  Agent Jaime-Molina began to follow the Jeep.  Agent Jaime-Molina observed HERNANDEZ merge into the number one lane, as if to pass the semi-truck in the I-10 number two lane.  As Agent Jaime-Molina approached, he saw that HERNANDEZ was traveling slower than the semi-truck, or approximately 60 MPH in a 70 MPH zone.  Agent Jaime-Molina then saw the rear end of the Jeep dip as HERNANDEZ accelerated. HERNANDEZ then merged in front of the semi-truck in what appeared to be an attempt to conceal himself to avoid interacting with law enforcement.

14.  Agent Jaime-Molina caught up to the Jeep and attempted to drive parallel with HERNANDEZ.  HERNANDEZ promptly reduced his speed to approximately 45 MPH.  As Agent Jaime-Molina continued to watch HERNANDEZ through his rear-view mirror he saw HERNANDEZ continuously driving over the fog line and the line dividing the lanes.

15.  Agent Jaime-Molina decreased his speed to allow HERNANDEZ to catch up.  HERNANDEZ slowly passed the marked agent then accelerated to over the posted speed limit of 70 MPH.

16.  At that time, Agent Jaime-Molina conducted a vehicle stop.  HERNANDEZ stopped the Jeep on the side of Interstate-10, near the Golf Center Parkway exit near Indio, California, and within the Central District of California.

17.  Agent Jaime-Molina approached the Jeep and identified himself as a Border Patrol Agent.  When prompted, HERNANDEZ stated he was traveling to Culver City, California after a

4

weekend in Phoenix, Arizona.  As Agent Jaime-Molina interacted with HERNANDEZ, he noted that HERNANDEZ spoke unusually fast, made quick and jerky movements, and showed other physical indicators of nervousness.

18.  HERNANDEZ provided Agent Jaime-Molina with his California driver's license as well as the registration for the Jeep.  Agent Jaime-Molina informed HERNANDEZ that he would conduct record checks and return shortly.

19.  While Agent Jaime-Molina conducted record checks, Border Patrol Agent Ceballos began talking with HERNANDEZ. During this conversation, HERNANDEZ gave consent for Agent Ceballos to conduct an exterior sniff of the Jeep with his canine partner.  Once the canine reached the front passenger door, the canine alerted by increasing her respirations and barking.  The canine also attempted to jump inside the vehicle through the open window.  When approaching the front driver's side door, the canine again alerted by increasing her respirations and barking.

20.  Based off the canine's alert, the agents conducted a search of the Jeep.  During the search, agents discovered firearm boxes containing what would later be revealed to be 11 firearms, 23 firearm magazines, and approximately 36 rounds of ammunition.  These boxes were concealed in the rear cargo area of the Jeep, underneath work and personal belongings.

21.  Agent Jaime-Molina asked HERNANDEZ what was in the Jeep, and HERNANDEZ replied, "a couple guns that I bought." HERNANDEZ went on to say that he purchased the firearms  in

5

Arizona.  At this time, HERNANDEZ was secured in handcuffs due to the large quantity of firearm cases found inside the vehicle. When asked by agents, HERNANDEZ stated that he was born in El Salvador, was not a United States Citizen, and was illegally present in the United States.

22.  At approximately 1:16 A.M., HERNANDEZ was placed under arrest.  Once in custody, HERNANDEZ requested for the SUBJECT DEVICE and his wallet to be transported with him.  HERNANDEZ stated that the SUBJECT DEVICE was located on the Jeep's front passenger seat and his wallet was in the glove box.  The SUBJECT DEVICE was later recovered from the Jeep.  The wallet was later found to contain $1,338 in cash.  An Identification card issued by the Republic of El Salvador was also found in the wallet. This identification card stated that HERNANDEZ is Salvadorean by birth, and that he was born in the town of Chalchuapa, El Salvador.

**B.    HERNANDEZ's Legal Status in the United States**

23.  Once HERNANDEZ was taken to the station, he was fingerprinted and searched in law enforcement databases, including the Department of Homeland Security database.  Because there was no record of HERNANDEZ entering the United States, combined with the information from HERNANDEZ's Salvadorean Identification card, Border Patrol determined that HERNANDEZ does not have lawful status to be in the United States.

**C.    Interstate Nexus**

24.  I am trained in the interstate nexus of firearms. On June 8, 2026, I examined the firearms recovered from HERNANDEZ's

6

vehicle.  I determined that each of the firearms were manufactured outside the state of California.  Because the firearms were recovered in California, and because HERNANDEZ said he purchased the firearms in Arizona, they must have been transported in interstate commerce.

## V.  TRAINING AND EXPERIENCE ON FIREARMS OFFENSES

25.  From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

a.  Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices.  It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals.  Such information is also kept on digital devices.

b.  Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices.  These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

c.  Those who illegally possess firearms often sell their firearms and purchase firearms.  Correspondence between

7

persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

d.    Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

### VI. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>[1]

26.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I

---

[1] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

27. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

28.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### VII.  <u>CONCLUSION</u>

29.   For all of the reasons described above, there is probable cause to believe that Juan Carlos HERNANDEZ Pineda has committed a violation of 18 U.S.C. § 922(g)(5): Alien in Possession of a Firearm.  There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICE described in Attachment A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 10th day of June
2026.

_____
THE HONORABLE ANNA Y. PARK
UNITED STATES MAGISTRATE JUDGE

11